COURT OF APPEALS OF VIRGINIA

Present: Judges Benton, Annunziata and Overton
Argued by teleconference


COMMONWEALTH OF VIRGINIA
                                        OPINION BY
v.  Record No. 1498-98-2          JUDGE JAMES W. BENTON, JR.
                                      DECEMBER 1, 1998
SHAMAAL L'TURE BENJAMIN


          FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                    Timothy J. Hauler, Judge

          Daniel J. Munroe, Assistant Attorney General
          (Mark L. Earley, Attorney General, on
          briefs), for appellant.

          Steven D. Benjamin (Betty Layne DesPortes;
          Benjamin & DesPortes, P.C., on brief), for
          appellee.


     A grand jury indicted Shamaal L'Ture Benjamin for capital

murder, first degree murder, three counts of malicious wounding,

and five counts of using a firearm in the commission of a felony.

 On appeal, the Commonwealth contends the trial judge erred in

granting Benjamin's pretrial motion to suppress a statement

Benjamin made during a police interrogation.  See Code

§ 19.2-398.  Benjamin cross-appeals two issues the trial judge

decided adversely to him.  For the reasons that follow, we affirm

the trial judge's order.

                              I.

     The evidence at the suppression hearing proved that on the

night of November 14, 1997, the police received information that

a person known as "Sha" had been involved in a double homicide in

Chesterfield County.  The police also learned that Sha lived in

an apartment "off of Hull Street" and had driven a stolen Nissan automobile. When the police arrived at the apartment complex early on November 15, 1997, they saw the stolen automobile.

Several police officers set up surveillance around the automobile. Sergeant Smith told Detective Ivey to detain anyone who entered the car. He specifically advised Detective Ivey to be on the lookout for a suspect named Sha, who was believed to be a fifteen to eighteen-year-old male. Detective Ivey later learned that Sha lived in one of the apartments in the building at 1408 Clarkson Road. He understood that Sha was somehow involved in a homicide but did not know the nature of Sha's involvement or whether a firearm was involved.

Detective Hensley, who was part of the surveillance team, was informed that the automobile had been involved in a double homicide, that it possibly was driven and occupied by four males involved in the homicides, and that a high-caliber semiautomatic rifle had been used in the incident. He testified that the officers had been told to look for Rosheen Waller, who was known by the name "Shaw."

At 9:30 a.m., a person entered the automobile and attempted to drive off. Because of a spiking device the officers placed on a tire, the tire flattened. However, before the officers could respond, the person exited the automobile and walked around the apartment building in the direction of apartment 1408 A. The officers were unable to identify the person but they proceeded to

- 2 -

apartment 1408 A.

When the officers arrived at the apartment, they knocked at the door, believing Waller resided there. Benjamin's mother responded to the knock on the door. Seeing Benjamin in the apartment, Detective Hensley asked him to identify himself. Benjamin said he was "Shamaal Benjamin." The officers told Benjamin they were looking for "Rosheen Waller, going by the nickname Shaw." When Benjamin told them Waller lived elsewhere, the officers left Benjamin's residence to search for Waller.

As the officers looked throughout the apartment complex, Christopher Thomas entered the stolen automobile. Detective Ivey and other officers detained Thomas and asked if his name was Sha. Thomas denied being Sha, said Sha had just walked past them to apartment 1408 A, and told the officers they could verify Thomas's identity by asking his cousin in apartment 1408 B. Thomas's cousin confirmed his identity.

Detective Ivey and several officers returned to apartment 1408 A and told Benjamin's mother they were looking for her son. Detective Ivey testified that when Benjamin's mother opened the door, he and another officer breached the doorway, stepped over the threshold of the front door, and asked to speak to her son. Detective Ivey saw Benjamin in the room and told Benjamin to come with him. When the officers took Benjamin outside, Thomas pointed to Benjamin and said, "That's Shaw." Detective Ivey then placed handcuffs on Benjamin.

Detectives Carroll and Church interrogated Benjamin at the Chesterfield Police headquarters. By stipulation, a videotape of the custodial interrogation was entered into evidence at the suppression hearing. The trial judge watched the videotape as Detective Church testified concerning his reading of the Miranda form and the interrogation of Benjamin. Detective Church testified that Benjamin's facial expressions, body language, and tone of voice never indicated to him that Benjamin did not understand everything that occurred during the interrogation. Benjamin confessed his involvement in the shooting incident.

In granting Benjamin's motion to suppress his statement, the trial judge made extensive findings. With regard to Benjamin's Fourth Amendment claim, the trial judge found that the officers' initial seizure of Benjamin in his apartment was a warrantless arrest. He also found that sufficient probable cause for the arrest "was developed just prior and contemporaneously" to the seizure. However, the trial judge found that the officers did not have consent to enter Benjamin's residence and that no exigent circumstances justified the warrantless entry. Thus, the judge found that Benjamin's arrest was unlawful and constituted an illegal seizure in violation of the Fourth Amendment.

With regard to Benjamin's Fifth Amendment claim, the trial judge found "as a matter of fact that the Miranda [rights advisal] . . . was done . . . in an unintelligible manner." Although the trial judge found that Benjamin's statement was not

- 4 -

a product of any police coercion, intimidation, threats, or promise of leniency, he found that Benjamin did not verbally acknowledge any understanding of the Miranda rights and that Benjamin did not waive his Fifth Amendment rights. He found that "any waiver of rights was not given freely, intelligently and voluntarily with full knowledge of the meaning and effect of the waiver that was being solicited."

As to Benjamin's Sixth Amendment claim, the trial judge found that Benjamin's request for counsel, "if it was made," was unintelligible and ambiguous.

## II.

Our review of the trial judge's ruling on the motion to suppress is governed by the following standards:

> [T]he burden is on the appellant to show that the trial court's decision constituted reversible error. We view the evidence in the light most favorable to the prevailing party, granting to it all reasonable inferences fairly deducible therefrom. We review the trial court's findings of historical fact only for "clear error," but we review de novo the trial court's application of defined legal standards to the particular facts of a case, such as determinations of reasonable suspicion and probable cause. Whether a defendant "invoked" his Miranda right[s] . . . during custodial interrogation and whether he "waived" [these] . . . right[s] are determined by applying judicially declared standards.

Quinn v. Commonwealth, 25 Va. App. 702, 712-13, 492 S.E.2d 470, 475-76 (1997).

Evidence in the record clearly supports the trial judge's

- 5 -

finding that Detective Church's reading of the Miranda rights form to Benjamin was unintelligible. The videotape of the interrogation was stipulated to be evidence. The detective's reading of the statement was so jumbled and unintelligible that the trial judge remarked, "Is he speaking in tongues?" Significantly, only when the detective is reading from the form is his diction unintelligible. The videotape demonstrates that the detective's other statements and questions to Benjamin, both before and after the unintelligible reading from the form, are clear and understandable. Upon review of the evidence, we hold that the trial judge's factual findings concerning the Miranda rights are not plainly wrong. Indeed, those findings are clearly supported by the evidence.

"[A]n individual held for interrogation must be clearly informed [of the Miranda rights]." Miranda v. Arizona, 384 U.S. 436, 471 (1966).

> "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination," commonly known as Miranda warnings. "Failure to give Miranda warnings prior to custodial interrogation requires suppression of any illegally obtained statements."

Timbers v. Commonwealth, 28 Va. App. 187, 194, 503 S.E.2d 233, 236 (1998) (citations omitted). The manner in which the detective read the statement to Benjamin was so unintelligible that it was functionally equivalent to not reading to Benjamin

- 6 -

the <u>Miranda</u> rights.

Furthermore, based on the evidence in the record, the trial judge did not err in ruling that the Commonwealth did not meet its "burden of proving that the defendant knowingly [, voluntarily,] and intelligently waived the constitutional privilege against self-incrimination and the right to counsel." <u>Goodwin v. Commonwealth</u>, 3 Va. App. 249, 252, 349 S.E.2d 161, 163 (1986).  The record establishes that after the detective read unintelligibly from the form, he showed Benjamin a form which asked, "Do you understand the rights that have been explained to you?"  The detective then told Benjamin to write "Yes" if he read and understood English.  The trial judge noted the following:

> Now, he says to the young man, he says to him on the tape, he said, "do you read and understand English?"  And then he says, "Write "yes" there."  . . . .
>
> It doesn't tell him he's waiving his rights. He says, "Sign yes here."  It says that I've read to you these rights, doesn't say that you understand these rights, it says that you understand and read English.  That's not what the form says.
>
> I find nowhere during the course of this taping that there was an active waiver, assuming that what he did was a full and complete rights advisal.  Where did he waive those rights, by signing this?

Upon our review of the evidence and the facts as found by the trial judge, we hold that the Commonwealth failed to bear its burden of proving Benjamin made a knowing, voluntary, and intelligent waiver of his <u>Miranda</u> rights.

In view of our holding, which affirms the trial judge's order suppressing the statement as a violation of Benjamin's Fifth Amendment rights, we need not address the Commonwealth's further contention that the trial judge erroneously based the suppression order on the additional grounds that Benjamin was unlawfully arrested in his home without a warrant and without exigent circumstances to justify the entry. For the same reason, we need not address Benjamin's contentions that he clearly invoked his right to counsel during the interrogation and that the trial judge erred in finding that the police had probable cause to arrest him.

For these reasons, we affirm the trial judge's order suppressing the evidence.

<u>Affirmed</u>.
